IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION



UNITED STATES OF AMERICA

v.

GREGORY ALVIN AUZENNE, M.D., and
TIFFANY ALEASHA CLARK

CRIMINAL NO. 2:19CR53-KSMTP

18 USC § 1349
18 USC § 1347
18 USC § 1343
18 USC § 371
42 USC § 1320a-7b(b)(1)(A), (B)
18 USC § 1035
21 USC § 846

## INDICTMENT

**The Grand Jury charges:**

### GENERAL ALLEGATIONS

### Compounded Medications

1. Section 505 of the Food, Drug, and Cosmetic Act ("Food and Drug Act") required drug manufacturers and producers to receive approval by the United States Food and Drug Administration ("FDA") before introducing new drugs into interstate commerce.

2. Section 502 of the Food and Drug Act exempted compounded medications from receiving FDA approval if the compounded medication was compounded by a licensed pharmacist, or other licensed professional, for an identified individual, based on the unsolicited receipt of a valid prescription that was medically necessary for the identified individual.

3. In other words, to be exempt from FDA approval, compounded medications were drugs that were combined, mixed, or altered by licensed pharmacists or other licensed practitioners, pursuant to valid prescriptions issued by licensed medical professionals, including physicians and nurse practitioners ("practitioners"), to meet the specific needs of individual patients

4. Practitioners could prescribe compounded medications to patients upon considering patients' diagnoses, medical conditions, health factors, and reactions to other medications. Although ingredients in compounded medications were generally approved by the FDA, the compounded form of those medications were not. There were risks associated with prescribing drugs that did not meet federal quality standards, so compounded medications were meant to be prescribed when the needs of a patient could not be met by an FDA-approved medication.

### Controlled Substances Act

5. The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. The CSA and the Code of Federal Regulations ("CFR") contained definitions relevant to this Indictment, some of which are set forth below.

6. Under the CSA, the United States Drug Enforcement Administration ("DEA") regulated certain pharmaceutical drugs that were classified as controlled substances because of their potential for abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision.

7. Controlled substances were classified into five schedules, from Schedule I through Schedule V. Schedule I contained the most dangerous drugs with the highest potential for abuse or dependence, and had no accepted medical use in the United States; and Schedule V contained the least dangerous drugs with the lowest potential for abuse or dependence, and had accepted medical uses in the United States.

8. The term "practitioner" was defined as a physician, nurse practitioner, or other individual licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which she or he practices, to distribute or dispense a controlled substance in the course of professional practice. 21 U.S.C. § 802(21).

9. The term "in-person medical evaluation" was defined as "a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals." 21 U.S.C. § 829(e)(2)(B)(i).

10. The term "covering practitioner" was defined as a practitioner who conducts a medical evaluation at the request of a practitioner who has already conducted an in-person medical evaluation or a telemedicine evaluation of the patient in the previous 24 months and is temporarily unavailable to conduct the evaluation. 21 U.S.C. § 829(e)(2)(C).

11. The term "dispense" meant to deliver a controlled substance to an ultimate user by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance. 21 U.S.C. § 802(10).

12. The term "distribute" meant to deliver (other than by administering or dispensing) a controlled substance. 21 U.S.C. § 802(11).

13. The DEA issued registration numbers to qualifying practitioners, including physicians and nurse practitioners, which permitted them to prescribe and dispense Schedule II, III, IV, and V controlled substances consistent with the terms of that registration.

14. Generally, Schedule IV drugs could only be dispensed by way of written or oral prescriptions issued by licensed and registered practitioners. 21 U.S.C. § 829(b).

15. "A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). In other words, a valid prescription was defined as "a prescription that is issued for a legitimate medical purpose in the usual course of professional practice by (i) a practitioner who has conducted at least 1 in-person medical evaluation of the patient; or (ii) a covering practitioner." 21 U.S.C. § 829(e)(2)(A).

16. Tramadol was a prescription opioid analgesic that was approved by the FDA for the treatment of moderate to moderately severe pain in adults. According to the FDA, tramadol could induce psychological and physical dependence of the morphine-type. Tramadol was a Schedule IV controlled substance under the laws of the state of Mississippi as of July 2011, and a Schedule IV controlled substance under the CSA as of August 18, 2014. 21 C.F.R. § 1308.14. Abuse of Schedule IV drugs could lead to limited physical dependence or psychological dependence. 21 U.S.C. § 812(b)(4).

### Health Care Benefit Programs and Claims Adjudication

17. The United States Department of Defense, through the Defense Health Agency, administered the TRICARE program ("TRICARE"), which was a comprehensive health care insurance program that provided health care benefits to United States military personnel, retirees, and their families.

18. In addition, various private insurance companies, including Blue Cross & Blue Shield of Mississippi, A Mutual Insurance Company ("BCBS"), provided health care benefits for individuals enrolled with their plans.

19. TRICARE and BCBS were each a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b).

20. Individuals who qualified for TRICARE benefits, and the benefits of other federal health care benefit programs, were referred to as "beneficiaries."

21. Individuals who qualified for benefits from these private insurance companies, including BCBS, were referred to as "members."

22. Medical service providers, including hospitals, clinics, physicians, nurse practitioners, and pharmacies ("providers"), meeting certain criteria, could enroll with health care benefit programs, including TRICARE and BCBS, and provide medical services to beneficiaries and

4

members. Providers would then submit claims, either electronically or in hard copy, to health care benefit programs seeking reimbursement for the cost of items and services provided.

23. TRICARE, BCBS, and the other health care benefit programs provided prescription drug coverage, including prescriptions for compounded medications, to eligible beneficiaries and members through their pharmacy programs or similar drug plans.

24. TRICARE's pharmacy program and other health care benefit programs' drug plans were administered by Pharmacy Benefit Managers ("PBMs"), whose responsibilities included adjudicating and processing payment for prescription drug claims submitted by eligible pharmacies. PBMs also audited participating pharmacies to ensure compliance with their rules and regulations.

25. Specifically, TRICARE, through the United States Department of Defense, contracted with Express Scripts to be its PBM.

26. CVS Caremark was another PBM that provided pharmacy management services to various health care benefit programs, including BCBS.

27. Providers, including pharmacies, entered into contractual relationships with PBMs, including Express Scripts and CVS Caremark, either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups, such as Epic Pharmacy Network, Inc. or Good Neighbor Pharmacy, which then contracted with PBMs on behalf of providers. Providers, whether directly or indirectly, by contracting with PBMs, agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

28. For prescription drugs, including compounded medications, to be reimbursed, health care benefit programs required that prescription drugs, including compounded medications, be dispensed pursuant to valid prescriptions and be medically necessary for the treatment of covered illnesses or conditions. In other words, health care benefit programs would not reimburse

prescription drugs, including compounded medications, which were not medically necessary or dispensed without valid prescriptions.

29. Upon receiving prescriptions, pharmacies submitted claims for dispensing prescription drugs to health care benefit programs or PBMs. Health care benefit programs or PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries. Specifically, beginning in or around January 2012, health care benefit programs permitted compounding pharmacies to submit claims and be reimbursed for each individual ingredient included in compounded medications. In other words, the more ingredients pharmacies included in the compounded medications, the higher the reimbursements pharmacies received from the health care benefit programs or PBMs.

30. Electronic claims submitted to PBMs by pharmacies located in Mississippi necessarily traveled via interstate wire to be adjudicated. For example, regardless of the location of the pharmacies that provided pharmacy benefits, Express Scripts adjudicated claims submitted electronically in Middlesex County, New Jersey, and CVS Caremark adjudicated claims submitted electronically in Maricopa County, Arizona.

**Relevant Entities and Individuals**

31. Medworx Compounding, LLC ("Medworx Pharmacy"), formed in August 2012 and located in Madison County, Mississippi, was an open-door, retail pharmacy that specialized in the production of compounded medications.

32. Rush Health Systems, LLC ("RHS") was a Mississippi Limited Liability Company doing business in Lauderdale County, Mississippi. RHS provided, among other services, pain management to TRICARE beneficiaries, and others.

33. Defendant **GREGORY ALVIN AUZENNE, M.D.** ("AUZENNE"), of Lauderdale County, Mississippi, was licensed to practice medicine in the states of Mississippi,

Alabama, and Texas, and did so through RHS. **AUZENNE** had the ability to prescribe medications.

34.     Defendant **TIFFANY ALEASHA CLARK ("CLARK")**, of Lauderdale County, Mississippi, was employed by RHS and provided secretarial services to **AUZENNE**.

35.     Marco Bisa Hawkins Moran ("Moran"), of Hinds County, Mississippi, was a pharmacist licensed to dispense pharmaceuticals in the state of Mississippi. Moran, and companies owned and controlled by Moran, co-owned, and marketed compounded medications on behalf of Medworx Pharmacy.

## THE FRAUDULENT SCHEME

### Overview

36.     In exchange for kickback and bribes, **AUZENNE** pre-signed blank, preprinted prescriptions for compounded medications ("fraudulent prescriptions"), and **CLARK** transmitted these fraudulent prescriptions to Moran, who then completed, by indicating which medications were to be dispensed, and ultimately delivered the fraudulent prescriptions to, among other pharmacies, Medworx Pharmacy. Based on these fraudulent prescriptions, Medworx Pharmacy and other compounding pharmacies dispensed compounded medications to beneficiaries and members, for which TRICARE and BCBS reimbursed more than approximately $1,766,401.06. These compounded medications, as **AUZENNE** and **CLARK** knew, were induced through the payment and receipt of unlawful kickbacks and bribes and were not medically necessary as Moran, a non-practitioner, ultimately decided which medications beneficiaries and members would receive.

### Purpose of the Scheme and Artifice

37.     It was a purpose of the scheme and artifice for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things, (a) offering, paying,

soliciting, and receiving kickbacks and bribes in exchange for arranging and recommending compounded medications to be dispensed to beneficiaries and members by, among other pharmacies, Medworx Pharmacy; (b) dispensing and causing the dispensing of medically unnecessary compounded medications to beneficiaries and members via the United States Postal Service and private or commercial interstate carriers ("carriers"); (c) submitting and causing the submission of false and fraudulent claims to TRICARE, BCBS, and other health care benefit programs; (d) concealing the offering, paying, soliciting, and receiving of kickbacks and bribes, the dispensing of medically unnecessary compounded medications via carriers, and the submission of false and fraudulent claims to health care benefit programs.

**Manner and Means of Scheme and Artifice**

The manner and means by which **AUZENNE**, **CLARK**, and their co-schemers sought to accomplish the object and purpose of the scheme and artifice included, among other things:

38. **AUZENNE** approached Moran and asked him to research how much money health care benefit programs paid for compounded medications. Through Moran, **AUZENNE** learned of the high reimbursements paid to compounding pharmacies by health care benefit programs for the dispensation of compounded medications.

39. To that end, Moran formulated compounded medications to be mass-produced by, and marketed on behalf of, among other pharmacies, Medworx Pharmacy. Rather than formulating compounded medications based on the individualized needs of beneficiaries or the medical efficacy of the compounded medication, Moran and other co-conspirators created formulas for compounded medications based on the reimbursement rate per ingredient included, in an effort to maximize reimbursement.

40. Moran and other co-conspirators created a check-the-box, pre-printed prescription form to make it easier for physicians to prescribe the specific compounded medications that

8

reimbursed at the highest rates.

41. In or around January 2014, Moran and **AUZENNE** created a "protocol" to select certain individuals whom **AUZENNE** had seen as patients in the past year at RHS who had diagnoses and insurance benefits that **AUZENNE** and Moran determined would be suitable for the prescription of compounded medications.

42. Moran provided **AUZENNE** with blank, pre-printed prescription forms detailing several compounded medication formulas, which were chosen based on their high reimbursement rates to facilitate the prescribing of compounded medications to RHS patients who fit **AUZENNE** and Moran's "protocol."

43. Between February 2014 and June 2014, **AUZENNE** signed blank, pre-printed prescription forms for TRICARE beneficiaries, BCBS members, and others who were patients of RHS, irrespective of whether these beneficiaries had legitimate medical needs for the compounded prescriptions (fraudulent prescriptions). Pursuant to the protocol, **CLARK** photocopied blank, pre-printed prescriptions that **AUZENNE** had signed authorizing the dispensing of expensive compounded medications.

44. At **AUZENNE's** direction, **CLARK** added patient and insurance information to these fraudulent prescriptions, and in turn, faxed these fraudulent prescriptions to Moran. Upon receiving the fraudulent prescriptions, Moran then chose and filled in the compounded medications that would be ultimately dispensed by Medworx Pharmacy under **AUZENNE's** name.

45. **AUZENNE**, in exchange for agreeing to sign blank pre-printed prescription forms, solicited kickback payments, namely $127,000, from Moran. Additionally, Moran paid **CLARK** over $14,000 for her role in filling in patient and insurance information and faxing the fraudulent prescriptions to Moran.

46. Moran then delivered the fraudulent prescriptions that **AUZENNE** authorized to,

9

among other pharmacies, Medworx Pharmacy, ultimately causing Medworx Pharmacy and other compounding pharmacies to dispense the compounded medications to individuals in the Southern District of Mississippi, including a TRICARE beneficiary located in Clarke County, Mississippi.

47. As a result of the fraudulent prescriptions that **AUZENNE** authorized, TRICARE and BCBS paid approximately $1,766,401.06 to Medworx Pharmacy and other compounding pharmacies.

## COUNT 1

### The Conspiracy and Its Objects

48. The allegations at paragraphs 1 through 36 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

49. Beginning in or around January 2014, and continuing through in or around December 2014, in Clarke, Madison, and Lauderdale Counties, in the Southern District of Mississippi, and elsewhere, the defendants, **GREGORY ALVIN AUZENNE, M.D.** and **TIFFANY ALEASHA CLARK**, did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Moran and other persons known and unknown to the Grand Jury to commit an offense against the United States, that is:

    a. to knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations and promises were false and fraudulent when made, and to knowingly transmit and cause to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such a scheme and artifice, in violation of Title 18, United States Code, Section 1343; and

b.  to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is TRICARE, BCBS, and other health care benefit programs, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

50. It was a purpose of the conspiracy for **AUZENNE**, **CLARK**, and their co-conspirators to unlawfully enrich themselves, as described in paragraph 37 of this Indictment, which is re-alleged and incorporated by reference as though fully set forth herein.

### Manner and Means of the Conspiracy

51. In furtherance of this conspiracy, and to accomplish its objects, the methods, manners, and means that were used are described in paragraphs 38 through 47 of this Indictment, and incorporated by reference as though set forth fully herein.

All in violation of Title 18, United States Code, Section 1349.

### COUNTS 2–4

### The Scheme and Its Execution

52. Paragraphs 1 through 36 of the Indictment are re-alleged and incorporated by reference as though fully set forth herein.

53. Beginning in or around January 2014, and continuing through in or around December 2014, in Clarke, Madison, and Lauderdale Counties, in the Southern District of Mississippi, and elsewhere, the defendants, **GREGORY ALVIN AUZENNE, M.D.** and **TIFFANY ALEASHA CLARK** aided and abetted by others known and unknown to the Grand Jury, did knowingly cause

to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, pictures and sounds, namely, false and fraudulent claims for compounded medications predicated on prescriptions pre-signed by **AUZENNE**, partially filled out and transmitted to Moran by **CLARK**, and dispensed by Medworx Pharmacy, between Madison County, Mississippi, and Middlesex County, New Jersey and Maricopa County, Arizona.

54. The scheme to defraud is more fully described in paragraphs 36 through 47 of the Indictment and is re-alleged and incorporated by reference as if fully set forth herein.

55. On or about the dates specified below, in the Southern District of Mississippi, and elsewhere, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, **AUZENNE** and **CLARK** submitted or caused to be submitted the following wire communications in interstate commerce, namely between Madison County, Mississippi and Middlesex County, New Jersey and Maricopa County, Arizona, in an attempt to execute, and in execution of the scheme, as described in paragraphs 36 through 47 of the Indictment, with each execution set forth below forming a separate count:

| COUNT | Beneficiary | Description of Interstate Wire Communication | Approximate Date Transmitted | Approximate Amount Paid | Defendant |
|---|---|---|---|---|---|
| 2 | K.S. | Prescription Number 100446 | 10/30/2014 | $12,010.87 | AUZENNE CLARK |
| 3 | S.B. | Prescription Number 100807 | 10/10/2014 | $12,303.01 | AUZENNE CLARK |
| 4 | R.S. | Prescription Number 100419 | 9/30/2014 | $9,810.69 | AUZENNE CLARK |

Each of the above is a violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 5

### The Conspiracy and Its Object

56. Paragraphs 1 through 36 and 38 through 47 of the Indictment are re-alleged and

incorporated by reference as though fully set forth herein.

57. Beginning in or around January 2014, and continuing through in or around December 2014, in Clarke, Madison, and Lauderdale Counties, in the Southern District of Mississippi, and elsewhere, the defendants, **GREGORY ALVIN AUZENNE, M.D.** and **TIFFANY ALEASHA CLARK** did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Moran and other persons known and unknown to the Grand Jury to commit an offense against the United States, that is, to knowingly and willfully solicit and receive remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, TRICARE; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, TRICARE, in violation of Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and 1320a-7b(b)(1)(B).

### Purpose of the Conspiracy

58. It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things, (a) offering, paying, soliciting, and receiving kickbacks and bribes in exchange for arranging and recommending compounded medications to be dispensed to TRICARE beneficiaries by, among other pharmacies, Medworx Pharmacy; and (b) submitting and causing the submission of claims to TRICARE for compounded medications procured by kickbacks.

### Overt Acts

59. In furtherance of the conspiracy, and to accomplish its object and purpose, the defendants and their co-conspirators committed and caused to be committed, in Clarke, Madison,

and Lauderdale Counties, in the Southern District of Mississippi, and elsewhere, the following overt acts:

    a.    Between approximately February 2014 and June 2014, **AUZENNE** signed blank prescriptions (fraudulent prescriptions) delivered to him by Moran.

    b.    Between approximately February 2014 and June 2014, at **AUZENNE's** direction, **CLARK** filled in patient and insurance information and faxed the fraudulent prescriptions to Moran.

    c.    Between approximately February 2014 and June 2014, Moran filled in the fraudulent prescriptions by selecting compounded medications to prescribe to the individuals listed on the forms and delivered the fraudulent prescriptions to, among other pharmacies, Medworx Pharmacy.

    d.    On or about June 23, 2014, in exchange for the fraudulent prescriptions, Moran paid a kickback to **AUZENNE** in the amount of $127,000. In an effort to conceal the true nature of this payment, Moran issued the check from a holding company to another company that Moran instructed **AUZENNE** to create to receive this payment.

    e.    On or about June 30, 2014, **AUZENNE** deposited the $127,000 check that he received from Moran into the checking account of a business that **AUZENNE** controlled.

    f.    Between approximately April 2014 and September 2014, in exchange for **CLARK's** services in adding patient and insurance information to the fraudulent prescriptions and forwarding the fraudulent prescriptions to Moran, Moran paid kickbacks to **CLARK** in the amount of $14,710.00.

    g.    Between approximately June 2014 and December 2014, based on the fraudulent prescriptions pre-signed by **AUZENNE** that **CLARK** sent to Moran and for which Moran paid **AUZENNE** and **CLARK**, Medworx Pharmacy and other compounding pharmacies

dispensed compounded medications to TRICARE beneficiaries located in the Southern District of Mississippi, including, on or about October 13, 2014, to a TRICARE beneficiary located in Clarke County, Mississippi.

All in violation of Title 18, United States Code, Section 371.

### COUNT 6

60. Paragraphs 1 through 36, 38 through 47, and 58 through 59 are re-alleged and incorporated by reference as though fully set forth herein.

61. On or about June 30, 2014, in Clarke, Madison, and Lauderdale Counties, in the Southern District of Mississippi, and elsewhere, the defendant, **GREGORY ALVIN AUZENNE, M.D.**, knowingly and willfully solicited and received remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for referring individuals for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole or in part by a Federal health care program, that is, TRICARE; and for the purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, item, and service for which payment may be made in whole and in part by a Federal health care program, that is, TRICARE, in violation of Title 42, United States Code, Sections 1320a-7b(b)(1)(A) and 1320a-7b(b)(1)(B) and Title 18, United States Code, Section 2.

### COUNT 7

62. Paragraphs 1 through 47, and 59 of the Indictment are re-alleged and incorporated by reference herein as though fully set forth herein.

63. Beginning in or around August 2014, and continuing through in or around December 2014, in Clarke, Madison, and Lauderdale Counties, in the Southern District of Mississippi, and elsewhere, the defendant,

15

**GREGORY ALVIN AUZENNE, M.D.,**

did knowingly and intentionally conspire, confederate, and agree with other persons known and unknown to the Grand Jury to distribute and dispense, outside the scope of professional practice and not for a legitimate medical purpose, quantities of tramadol, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code Section, 846.

### COUNT 8

64. Paragraphs 1 through 47, and 59 of the Indictment are re-alleged and incorporated by reference herein as though fully set forth herein.

65. Beginning in or around October 2014, and continuing through in or around November 2014, in Lauderdale County, in the Southern District of Mississippi, and elsewhere, the defendant,

**GREGORY ALVIN AUZENNE, M.D.**

did knowingly and willfully falsify, conceal, cover up by any trick, scheme, and devise a material fact in connection with the delivery of and payment for health care benefits, items, and services; that is **AUZENNE** executed an affidavit under oath in response to an audit conducted by BCBS attesting that he authorized prescriptions for compounded medications for BCBS members that omitted how: (a) **AUZENNE** had pre-signed blank prescriptions; (b) at **AUZENNE's** direction, **CLARK** had filled in patient and insurance information and faxed these fraudulent prescriptions to Moran; and (c) Moran had completed the fraudulent prescriptions deciding which compounded medications the BCBS members would receive, in violation of Title 18, United States Code, Sections 1035 and 2.

### FORFEITURE ALLEGATIONS

1. Upon conviction of Count 1 contained in this Indictment, defendant **GREGORY ALVIN AUZENNE, M.D.**, shall forfeit to the United States pursuant to Title 18, United States

Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds of the violations, including but not limited to a sum of money equal to the amount of gross proceeds of the offenses.

2. Upon conviction of Count 1 contained in this Indictment, defendant **TIFFANY CLARK** shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds of the violations, including but not limited to a sum of money equal to the amount of gross proceeds of the offenses.

3. Upon conviction of Counts 2 through 6 and 8 contained in this Indictment, defendant **GREGORY ALVIN AUZENNE, M.D.**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds of the violations, including but not limited to a sum of money equal to the amount of gross proceeds of the offenses.

4. Upon conviction of Counts 2 through 5 contained in this Indictment, defendant **TIFFANY ALEASHA CLARK** shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(7), and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived, directly or indirectly, from gross proceeds of the violations, including but not limited to a sum of money equal to the amount of gross proceeds of the offenses.

5. Upon conviction of Count 7 contained in this Indictment, the defendant, **GREGORY ALVIN AUZENNE, M.D.**, shall forfeit to the United States pursuant to Title 21, United States Code, Section 853, any property constituting, or derived from, proceeds obtained,

directly or indirectly, as a result of the violations, including but not limited to a sum of money equal to the amount of gross proceeds of the offenses.

6. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

*[signature]*
D. MICHAEL HURST, JR.
UNITED STATES ATTORNEY

A TRUE BILL:

s/ signature redacted
─────────────────────
Foreperson of the Grand Jury

This indictment was returned in open court by the foreperson or deputy foreperson of the Grand Jury on this the 24th day of September, 2019.

*[signature]*
─────────────────────
UNITED STATES MAGISTRATE JUDGE

18