IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION


UNITED STATES OF AMERICA

v.                                          CRIMINAL NO. 2:19-CR-53-KS-MTP

GREGORY ALVIN AUZENNE, *et al.*


## MEMORANDUM OPINION AND ORDER

For the reasons provided below, the Court **denies** Defendants' Motions to Continue [49, 53] and **denies** Defendants' Motion to Expand the Jury Venire [61, 65].

## I. BACKGROUND

On September 24, 2019, the Government filed an Indictment [1] charging Defendants with a variety of crimes arising from a conspiracy to defraud government health care benefit programs by marketing, prescribing, and billing for compounded medications. Specifically, the Government alleges that Defendant Auzenne pre-signed blank, pre-printed prescriptions for compound medications that served no legitimate medical purpose, and that Defendant Clark transmitted the signed, fraudulent prescriptions to an intermediary who completed them and delivered them to a pharmacy. The Government claims that Defendants bilked government health care benefit programs of approximately $1,766,401.06, and that Auzenne and Clark accepted illegal kickbacks and bribes as inducement to participate in the scheme. The Court's initial Trial Order [13] set a trial date of November 19, 2019.

On November 1, 2019, the Government filed a Motion to Continue [26],

representing that it had only just produced the bulk of its discovery materials, and that it anticipated Defendants would need additional time to review the documents and prepare for trial. The Court granted the motion by a text order on November 15, 2019, and stated that a new trial date would be determined on a later date.

In a telephonic conference with the parties on December 10, 2019, the Court suggested that the trial of this matter be set for May 18, 2020. The parties tentatively agreed. On the same day, Defendant Auzenne filed a Motion Requesting Trial Setting [35], which was joined by Defendant Clark and the Government. The parties agreed with the Court's suggestion and requested that the Court set the case for trial on May 18, 2020. Accordingly, the Court entered an Amended Trial Order [36, 37], setting this case for trial on May 18, 2020.

On March 13, 2020, the President declared a nationwide state of emergency due to the COVID-19 pandemic, and on March 14, 2020, the Governor of Mississippi likewise declared a state of emergency. On the same day, the Chief Judge of this Court entered a Special Order continuing all non-essential civil and criminal matters set for hearing or trial in any federal courthouse within the Southern District of Mississippi, effective through March 31, 2020. *See* Special Order, *In re Administrative Orders of the U.S. District Court*, No. 3:40-MC-11 (S.D. Miss. Mar. 13, 2020), ECF No. 52. In general terms, the order gave presiding judges substantial discretion to determine whether matters are essential, authorized Court Security Officers ("CSO's") to screen any visitors to a federal courthouse for potential risk of COVID-

19 transmission, outlined certain health and/or exposure risk factors for counsel to consider before appearing in court, directed counsel to notify the Court at least twenty-four hours prior to any proceeding if they had been exposed to said risk factors, and encouraged all judges and counsel to utilize video and teleconferencing where possible. These measures had no effect on the present case because there were no live hearings scheduled, and the parties continued preparing for trial.

On March 23, 2020, Defendant Auzenne filed a Motion to Continue [40] the trial date and all other relevant deadlines. Defendant Auzenne represented that the Government had produced more documents on February 3, 2020, and that his counsel needed more time to review them and prepare for trial. Defendant also represented that his counsel was unable to conduct a proper investigation into the facts of the case because of the emerging COVID-19 situation, and he requested a five-month continuance. Defendant Clark joined the motion [42], and the Government did not oppose it [44]. Accordingly, the Court granted the motion [45] and initially continued the trial of this matter to September 28, 2020, but later extended the continuance to November 2, 2020.

On March 31, 2020, the Chief Judge entered Special Order #2, noting that the pandemic had grown exponentially in the United States, and that the Judicial Conference of the United States had found that the emergency had affected and would continue to affect the functioning of the federal courts. *See* Special Order #2, *In re Administrative Orders of the U.S. District Court*, No. 3:40-MC-11 (S.D. Miss.

3

Mar. 31, 2020), ECF No. 53. The order generally extended the measures implemented in the Chief Judge's previous special order, but it also deemed certain criminal proceedings essential and directed the United States Marshals Service ("USMS") to take pretrial detainees for medical screenings before they appear in court. On May 1, 2020, the Chief Judge entered Special Order #4, which extended the effective date of Special Order #2 to May 31, 2020. *See* Special Order #4, *In re Administrative Orders of the U.S. District Court*, No. 3:40-MC-11 (S.D. Miss. May 1, 2020), ECF No. 57. Once again, these measures had no effect on the present case because there were no live hearings scheduled, and the parties continued preparing for trial.

On April 1, 2020, the Governor of Mississippi issued Executive Order No. 1466 instituting a statewide shelter-in-place order, effective until April 20, 2020. On April 17, 2020, the Governor extended the statewide shelter-in-place order to April 27, 2020. From April 24, 2020, through May 28, 2020, the Governor issued a series of executive orders gradually loosening these restrictions. He observed that the number of infections in Mississippi had stabilized, that there was a decreased utilization of hospital resources, and that the state's health care system had sufficient capacity to address the crisis. This series of orders culminated in a "Safe Return" order, providing measures to restart the economy and resume community activities under certain limitations. Among other things, the Governor ordered that all state courts shall be open to fulfill their constitutional and statutory duties. The Governor generally continued the "Safe Return" measures in numerous executive orders from June 10,

2020, through September 13, 2020 – occasionally imposing more restrictions on counties with higher infection rates, gradually decreasing statewide restrictions, and addressing particular issues as they arose.

On May 29, 2020, the Chief Judge of this Court entered Special Order #6. *See* Special Order #6, *In re Administrative Orders of the U.S. District Court*, No. 3:40-MC-11-KS-MTP (S.D. Miss. May 29, 2020), ECF No. 60. He found that the number of reported COVID-19 cases in the District had stabilized, although there had been occasional spikes. He also found that the number of patients in ICU's and on ventilators had not appreciably changed and remained relatively low. Finally, he noted that state and local governments were easing restrictions. Accordingly, the Court concluded that it should start to resume normal court operations, at least in some portions of the District. Therefore, effective through June 30, 2020, Special Order # 6 continued all civil and criminal jury trials, but it granted presiding judges discretion to hold all other in-court hearings and proceedings. The Chief Judge set out certain precautions that should be observed in such proceedings, extended the previous directions regarding screening of visitors to courthouses, and extended the Court's authorization of videoconferencing for certain criminal proceedings, including felony pleas and sentencings. Once again, these measures had no effect on the present case, and the parties continued preparing for trial.

On July 1, 2020, the Chief Judge entered Special Order # 7, which extended the restrictions and requirements imposed by his previous Special Order for another

month. *See* Special Order #7, *In re Administrative Orders of the U.S. District Court*, No. 3:40-MC-11-KS-MTP (S.D. Miss. July 1, 2020), ECF No. 61. He noted that the seven-day average of new cases across the state had increased. However, he acknowledged that the risk of transmission was not uniform across the district in all types of proceedings, and he continued to allow presiding judges to assess the circumstances of each case and exercise their discretion to hold in-person hearings. He extended the moratorium on jury trials – except for one to be held in the Southern Division, where the infection rate was lower than in other divisions. *See* Memorandum Opinion and Order, *United States v. Walters*, No. 2:19-CR-51-KS-MTP (S.D. Miss. June 22, 2020), ECF No. 213. One month later, the Chief Judge entered Special Order # 8, extending the same measures until the middle of September. *See* Special Order # 8, *In re Administrative Orders of the U.S. District Court*, No. 3:40-MC-11-KS-MTP (S.D. Miss. July 31, 2020), ECF No. 63.

On August 4, 2020, the Governor of Mississippi entered Executive Orders No. 1516 and 1517. He noted statewide increases in the number of COVID-19 cases, hospitalizations, and ICU utilization, and found that additional measures were necessary to reduce transmission of the virus. Therefore, he imposed a statewide requirement that every person over the age of five must wear a face covering over their nose and mouth when inside buildings open to the public or in outdoor public spaces where it is not possible to social distance. He also delayed the beginning of the public school year in counties with high infection rates.

On September 11, 2020, the Chief Judge entered Special Order # 10. *See* Special Order # 10, *In re Administrative Orders of the U.S. District Court*, No. 3:40-MC-11-KS-MTP (S.D. Miss. Sept. 11, 2020), ECF No. 66. He observed that Mississippi's seven-day average of new COVID-19 cases had dropped precipitously since its peak in early August. Likewise, the number of patients on ventilators and in ICU's had declined. However, the case numbers were still higher than those that had prompted the Court's initial suspension of jury trials in March. In light of the growing backlog of criminal cases, the Court developed a Jury Resumption Plan, which included a number of measures to mitigate the risk of transmitting COVID-19 while holding jury trials. The Court extended the continuance of civil jury trials, but it granted presiding judges the discretion to move forward with criminal trials as they deemed necessary. In all other respects, the Court largely retained the measures and restrictions it implemented in March.

On September 30, 2020, the Governor of Mississippi entered Executive Order No. 1525, repealing all previous COVID-19 executive orders and instituting a "Safe Recovery" plan. He noted that the state had seen a significant decline in the number of COVID-19 infections and hospitalizations, and that experience and expert opinions had shown that simple measures such as wearing a face covering, practicing social distancing, and washing one's hands can reduce the transmission of the virus. Therefore, the Governor lifted the statewide mask mandate, while strongly encouraging citizens to follow CDC recommendations regarding face coverings, social

distancing, hygiene, and self-quarantining. He continued requiring masks in school buildings and campuses, subject to certain exceptions. All businesses and non-profit entities were generally permitted to operate, with some restrictions imposed on particular types of businesses. He specifically ordered that all state courts were open to fulfill their constitutional and statutory duties, subject to any administrative orders entered by the Supreme Court of Mississippi.

On September 8, 2020, the Court entered an Order [48] for the parties to show cause why the trial of this matter should not be held in the Southern Division, at the Dan Russell United States Courthouse in Gulfport, Mississippi. The Court observed that its facilities in Hattiesburg, Mississippi are unable to accommodate a criminal trial while maintaining appropriate social distancing and other measures to mitigate the risk of spreading COVID-19.

In response, Defendant Auzenne filed a Motion to Continue [49] the trial and all other relevant deadlines, and on September 22, 2020, Defendant Clark filed her own Motion to Continue [53]. Defendants argue that it is unsafe and impractical to hold a jury trial right now, and that the risk of transmitting COVID-19 and mitigation measures implemented by the Court will impede their ability to receive a fair trial. They also argue that the Northern Division would be a more appropriate venue for trial than the Southern Division. The Government disagreed, arguing [54, 55] that it would be appropriate to hold the trial in the Southern Division. Finally, Defendants also filed Motions to Expand the Jury Venire [61, 65], arguing that the Court should,

at a minimum, draw a jury from both the Northern and Southern Divisions.

## II. DISCUSSION

There are three related issues the Court must address: the venue for trial, the jury pool from which the venire will be drawn, and the date on which the trial will be held.

### A.    Venue

The Constitution and Rule 18 require that a criminal trial be held in the district in which the crime occurred. U.S. CONST. art. 3, § 2, cl. 3; U.S. CONST. amend. VI; FED. R. CRIM. P. 18. But the Constitution does not require that a criminal trial be held in any particular division within a district. *United States v. Lipscomb*, 299 F.3d 303, 339 (5th Cir. 2002). Moreover, "a criminal defendant is only entitled to a jury drawn from the federal district in which the crime was committed, although the jury may be drawn from a division of the district rather than the entire district." *United States v. Mills*, 389 F. Supp. 3d 528, 533 (E.D. Mich. 2019) (citing numerous cases). The Rules of Criminal Procedure only require the Court to "set the place of a trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice." FED. R. CRIM. P. 18.[1] "Although the text of Rule 18 refers only to convenience and prompt administration, the district court may consider other factors." *Lipscomb*, 299 F.3d at 340. Therefore,

---

[1] The Court may also consider other facts, such as pretrial publicity. *Lipscomb*, 299 F.3d at 340, 343-44. No party has provided any evidence of substantial pretrial publicity, however, and the Court does not believe it is a significant issue in this case.

the Court should consider practical issues such as the adequacy of the facilities. *See, e.g. United States v. Roberson*, 124 F. App'x 860, 864-65 (5th Cir. 2005); *United States v. Harris*, 25 F.3d 1275, 1278 (5th Cir. 1994).

Regardless, "venue exists anywhere within the judicial district in which the crime was committed," and "there is no right to trial within a particular division in a district." *United States v. Weddell*, 800 F.3d 1404, 1406 (5th Cir. 1986); *see also Lipscomb*, 299 F.3d at 337-38. Accordingly, "[w]ithin-district transfers of criminal cases are allowed under the law in this circuit," and they do not implicate the Sixth Amendment. *Lipscomb*, 299 F.3d at 338-39.

As the Court noted in its previous order, it is not possible to hold a criminal jury trial in the Eastern Division while maintaining appropriate social distancing and other COVID-19 mitigation measures. The Hattiesburg courthouse does not have a jury assembly room. Jurors enter the courthouse through the same entrance as attorneys, parties, and witnesses, and they use the same elevators, stairwells, and corridors. Additionally, the corridors in Hattiesburg are relatively narrow, and the public restrooms are relatively small. In contrast, the Gulfport courthouse has a jury assembly room, its corridors are broader, and its public restrooms are larger. Moreover, the Court has developed a plan for jury trials in Gulfport in which jurors can be socially distanced from each other and any other persons for virtually the entire duration of a trial. The Court will explain some of the features of this plan below. For now, the Court must simply note that it is not possible to implement

10

appropriate COVID-19 mitigation protocols in the Eastern Division because of the facility's limitations.

Defendants do not object to transferring venue out of the Eastern Division. Rather, they argue that the Northern Division would be a more appropriate venue than the Southern Division because both Defendants and some witnesses reside in Meridian, Mississippi, which is closer to Jackson than it is to Gulfport. It is approximately 92 miles from Meridian to Jackson, 160 miles from Meridian to Gulfport, and 88 miles from Meridian to Hattiesburg. Therefore, any of the potential venues for this trial will require travel and, presumably, lodging. Although Defendants have not identified any specific witnesses, the Court will accept their representation that some witnesses reside in Meridian. It is fair to assume, however, that some witnesses do not reside in Meridian.[2] At this point, neither party has provided the Court with a witness list, and in the absence of more specific information, the convenience of witnesses – while not inconsequential – is not a particularly persuasive point for or against any venue.

Regardless of whether the trial is held in Jackson or Gulfport, Defendants' counsel – both of whom reside in Hattiesburg – will still have to travel. The Court believes the difference in travel time is negligible, whether comparing Defendants' own travel time from Meridian or their counsel's travel time from Hattiesburg. Either

---

[2] The indictment [1] refers to a co-conspirator in Hinds County, Mississippi, and a TRICARE beneficiary in Clarke County, Mississippi. It also refers to alleged criminal actions by Defendants in Clarke and Madison Counties in Mississippi, as well as Middlesex County, New Jersey, and Maricopa County, Arizona.

way, when evaluated within the context of a two-week white-collar criminal trial, the additional cost of gasoline and/or a couple of hotel rooms is slight in comparison to the whole cost of defense. This within-district transfer is a far cry from those the Fifth Circuit has deemed an abuse of discretion. *See, e.g. United States v. Garza*, 593 F.3d 385, 390 (5th Cir. 2010) (transfer to division over 300 miles away); *Lipscomb*, 299 F.3d at 338-39 (transfer to division over five hours away).

Finally, the "prompt administration of justice," FED. R. CRIM. P. 18, necessarily requires the Court to consider basic logistical concerns, such as the availability of courtrooms. The Court currently has a backlog of criminal cases awaiting trial. Four different judges have cases scheduled for trial in the Northern Division from late October to early November. As part of the Court's Jury Resumption Plan, the beginnings of trials are staggered so that only one venire at a time will report for voir dire. As a result, there is no courtroom available in the Northern Division during the window of time that this case is scheduled for trial. In contrast, only one other judge currently has a trial scheduled in the Southern Division during the relevant time frame, and the Court can stagger the start dates of the trials to avoid two venires reporting on the same day.

In summary, Defendants have not demonstrated that a trial in Jackson would be appreciably more convenient than a trial in Gulfport. Moreover, the Court's consideration of the prompt administration of justice requires it to consider the logistical concerns of safely holding a jury trial during a global pandemic when the

Court already has a backlog of criminal cases and multiple judges vying for courtroom time. After consideration of all these factors, the Court concludes that the trial of this matter should be held in the Southern Division, at the Dan Russell Courthouse in Gulfport, Mississippi.

**B.      *Jury Pool***

Defendants also filed Motions to Expand the Jury Venire [61, 65] to include the Northern Division. If the trial is held in the Southern Division, they want the jury pool to be drawn from both the Southern and Northern Divisions. Defendants argue that this is necessary to ensure adequate juror turnout due to the purported "high incidence" of COVID-19 in the Southern Division, and that it will safeguard their right to a jury drawn from a fair cross section of the community.

First, the incidence of COVID-19 is no higher in the Southern Division than it is in the Northern Division. According to the Mississippi Department of Health ("MSDH"), as of October 4, 2020, Jackson and Harrison Counties combined had had 8,449 total cases of COVID-19, while Hinds and Madison Counties combined had had 10,987 total cases.[3] Adjusted for population, Harrison County had 2,124.2 cases per 100,000 residents, Jackson County had 2,805.4, Hinds County had 3,224.6, and Madison County had 3,303.8. These four counties – Jackson and Harrison in the Southern Division, and Hinds and Madison in the Northern Division – contain the bulk of the population in their respective divisions, and all four were near the top of

---

[3] *See* msdh.ms.gov/msdhsite/_static/resources/8634.pdf (last visited Oct. 14, 2020).

MSDH's list of counties with new COVID-19 cases for the week of September 28 through October 4, 2020. In light of these numbers, it is reasonable to conclude that expanding the jury pool to include the Northern Division does not reduce the likelihood of jurors not reporting because of COVID-19 infection, or of infected jurors reporting and transmitting the virus to other jurors. In fact, Hinds and Madison Counties have a higher rate of infection.

Second, Defendants have not demonstrated that drawing the venire from the Southern Division alone will compromise their right to a trial by a fair cross section of the community. The Court will address this issue in more detail below. For now, the Court notes that Defendants' argument is based on rank speculation. They have not provided any evidence or argument that the Court's Jury Selection Plan fails to comply with the applicable statutes, destroys the random or objective nature of the jury selection process, and/or causes any systematic exclusion in the jury selection process.

Finally, although the Court may use a district-wide jury pool, *see* 18 U.S.C. § 1861, the Court believes that doing so would only increase the likelihood of a mistrial due to juror illness or the transmission of COVID-19. In a district-wide jury pool, jurors could potentially have to travel over three hours one-way to serve, increasing their overall exposure as they are forced to interact with other persons in restaurants, gas stations, and perhaps hotels.

Therefore, the Court concludes that Defendants have not provided the Court

with any legitimate reason to expand the venire beyond the Southern Division. Moreover, they have not cited any law providing the Court with authority to draw the venire from two of the District's four divisions, as opposed to the division where the trial will be held or the entire District. *See* 18 U.S.C. § 1861. The Court will employ measures, explained in greater detail below, to ensure that Defendant receives a venire from a fair cross section of the community. Accordingly, the Court **denies** Defendants' Motions to Expand the Jury Venire [61, 65].

## C.   *Continuance*

Finally, Defendants argue that the Court should continue the trial of this matter. Defendants argue that it is unsafe and impractical to hold a jury trial right now because of the danger of transmitting COVID-19. They contend that holding a trial in early November will compromise their right to counsel during trial, their right to be tried by a jury drawn from a fair cross section of the community, their right to confront witnesses, and their right to compulsory process of witnesses.

"A motion for a continuance is addressed to the discretion of the trial court." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1193 (5th Cir. 1986); *see also United States v. Rounds*, 749 F.3d 326, 337 (5th Cir. 2014). "When the question of the trial court is a scheduling decision, such as whether a continuance should be granted, the judgment range is exceedingly wide, for, in handling its calendar and determining when matters should be considered, the district court must consider not only the facts of the particular case but also all of the demands on counsel's time and the court's."

15

*Fontenot*, 780 F.2d at 1193. When reviewing a motion for a continuance of trial, the Court should consider the "totality of the circumstances, including (a) the amount of time available; (b) the defendant's role in shortening the time needed; (c) the likelihood of prejudice from denial; (d) the availability of discovery from the prosecution; (3) the complexity of the case; (f) the adequacy of the defense . . . ; and (g) the experience of the attorney with the accused." *United States v. Diaz*, 941 F.3d 729, 740 (5th Cir. 2019). The Court should also consider the public's interest in promptly bringing a defendant to trial. *See United States v. Blevins*, 755 F.3d 312, 318 (5th Cir. 2014).

### 1.    *The Court's Plans*

Before the Court addresses Defendants' arguments, it would be beneficial to provide a comprehensive review of the protocols and procedures the Court plans to observe at trial to reasonably mitigate the risk presented by the COVID-19 pandemic. First, the jury summons for this case included a letter from the Chief Judge that provided the jurors with a brief overview of the protective measures that would be in place, and it instructed them to bring their own masks. The letter also instructed potential jurors to immediately contact the Jury Administrator if 1) they have been diagnosed with COVID-19 or have been in close contact with someone who was diagnosed with COVID-19, 2) they are now in self-quarantine status, 3) they have symptoms associated with COVID-19, or 4) any other circumstances render them incapable of serving on a jury in November. The letter also included the Chief Judge's

16

assurance that the Court recognizes and has prepared for the risks posed by the pandemic.

The Court is staggering the beginning of jury trials such that only one panel of potential jurors will report per day. No more than two jury trials will be conducted in the same courthouse in a given week. In the jury assembly area, chairs will be roped off or removed, allowing for at least six feet of distance between individuals. The Court will install additional portable seating in the lobby area adjacent to the jury assembly room, and, if needed, additional overflow seating may be available in the gallery of one of the courtrooms. Additional CSO's will be on duty to coordinate with Clerk's Office personnel to manage juror movement and ensure social distancing.

All jurors will undergo the pre-screening protocols by CSO's currently in place pursuant to the Chief Judge's Special Orders. Devices have been installed that automatically measure the temperature of each person who enters the courthouse. In addition, Clerk's Office personnel will use no-contact thermometers to take the temperature of each prospective juror. Likewise, the Court will take the temperature of each empaneled juror on each day of trial. Those with a temperature above 99° F will be excused. Floor decals have been placed in front of juror check-in counters at six-foot intervals to ensure social distancing. All Jury Department and Clerk's Office personnel will wear masks and gloves, and masks and/or face shields will be available for prospective jurors. Hand sanitizer stations will be available in the Jury Assembly room, courtrooms, and jury deliberation rooms.

The GSA modified the HVAC system in the Gulfport courthouse to circulate and filter the air in the building more during the hours the Court is not in operation. Additionally, the GSA confirmed the rating of the HVAC system's filters and upgraded them where possible.

Every member of the venire will be given a questionnaire regarding their potential exposure to COVID-19 and whether they have any symptoms. The responses to this questionnaire will be maintained by the Court under seal to protect the venire's personal health information. The Court will also ask the same questions during voir dire. If any response to the questionnaire raises concerns, the Court will apprise the parties of the situation, seek their input, and address the matter during voir dire. Once a jury is empaneled, the Court will have the seated jurors answer the same questionnaire on each day of the trial and maintain their responses under seal. Again, if any response to the daily questionnaire raises concerns, the Court will apprise the parties of the situation and seek input before determining a course of action.

The Court will conduct voir dire in two panels. One group of potential jurors will arrive in the morning, and another group will arrive in the afternoon. The Court estimates that approximately forty-two potential jurors can be seated in the courtroom while maintaining social distancing. If more than forty-two jurors appear during each session of voir dire, the Court will seat them in the well and move counsel closer to the bench. Each party will only be permitted to have four people in the

courtroom during voir dire. It is unlikely that there will be room for any press or other onlookers. Rather than pass a microphone around, the Court will erect microphone stands at multiple spots throughout the courtroom. The microphone will either have some form of disposable cover over it, or it will be cleaned after each use.

All persons entering the courthouse will be required to wear a mask or face shield. In the courtroom, all persons will be required to wear a mask or face shield at all times, unless they are speaking. The Court will have masks and face shields available, but it strongly encourages the parties to bring their own.

Throughout the trial, an extra row of seating will be added to the jury box, and those sitting in the jury box will be required to skip every other seat, maintaining social distancing. Clear vinyl sheeting will be erected in front of each row in the jury box. Every other row in the gallery will be roped off or otherwise closed, and those sitting in the open rows will be required to maintain six feet of distance from one another.

No more than one attorney from each side will be allowed to approach the bench during a sidebar. Two plexiglass or vinyl barriers will be erected at sidebar – one separating the judge from counsel, and another between the two opposing counsel. Additionally, a plexiglass barrier will be installed on the front of the witness box, so that counsel can approach the witness as necessary during trial.

The Court will strictly monitor the number of people in the courtroom and require social distancing in the gallery. To accommodate those unable to attend in-

person, the Court will live-stream audio from the trial and provide a web link to any person who requests it.

Each day, the courtroom, jury room, witness rooms, bathrooms, and public areas of the courthouse will be thoroughly cleaned and sanitized. In between witnesses, the witness box will be wiped down and/or sprayed with disinfectant.

The Court proposed and the parties agreed that each side will form its own "family" or "quarantine" unit, and, therefore, social distancing will not be required at counsel tables during the trial. The Court will not presently limit the number of people at counsel tables during trial, but the Court reserves the right to limit the number of people at counsel tables, as well as in the courtroom, gallery, or well, if necessary to ensure safe conditions for everyone involved in the trial. The Court also reminds the parties that the limited seating in the gallery will be available on a first-come-first-served basis.

The Court may conduct voir dire in the 8th Floor West courtroom because it is slightly larger than the other courtrooms. The trial will be held in the 5th Floor West courtroom. The 5th Floor East courtroom will serve as the jury room, where they will assemble, take breaks, and deliberate. Accordingly, the doors to the 5th Floor East courtroom will be locked at all times. The jury will enter and exit via the secured elevator and hallways behind the courtrooms, and CSO's will ensure that they maintain social distancing. The Court will provide the jury with lunch each day, so that they do not have to leave the courthouse. The Court will also periodically instruct

the jury regarding social distancing, the measures taken by the Court to ensure their safety, and their responsibility as jurors to safeguard their own health and diligently attend to the evidence presented at trial.

　　2.　　*Defendants' Arguments*

First, Defendants generally argue that it is unsafe and impractical to hold a jury trial right now because of the danger of transmitting COVID-19. The Court's procedures, as explained above, in the Court's Special Orders, and in the Court's COVID-19 Jury Resumption Plan, are reasonably sufficient to mitigate the risk of transmitting COVID-19. Every person entering the courthouse will be screened. Everyone will be wearing masks or face shields. Hand sanitizer will be available, and special cleaning measures will be observed. Social distancing will be enforced, and the Court will strictly limit the number of people in the courtroom.

If Defendants are concerned with attorneys or witnesses traveling from out-of-town, they are free to travel to Gulfport sufficiently in advance of the trial to quarantine before it begins. Regardless, one advantage of having a multi-week trial is that there is more time to negotiate problems with witnesses' availability. The parties can take witnesses out of order if necessary, and Defendants have even more time to ensure their witnesses' availability because they won't be needed until after the Government completes its case-in-chief.

Next, Defendants argue that holding a trial in early November will compromise their right to counsel. Defendants contend that they will not be able to

effectively communicate with counsel if they are forced to wear masks and/or social distance in the courtroom. The Court has offered Defendants and their counsel the option of forming "family" or "quarantine" units during the weeks leading up to trial, in which case they would not have to social distance at counsel table. If Defendants decline that offer, they are free to use pen and paper, instant messaging, phones, tablets, or other technology to communicate as needed during trial. Additionally, the Court anticipates that it will provide more breaks during the trial than usual, within reason. Regardless, courts have found that requiring a defendant to sit several feet away from his attorney during trial does not constitute a deprivation of counsel. *See, e.g. United States v. Levenite*, 277 F.3d 454, 465-66 (4th Cir. 2002); *United States v. Balsam*, 203 F.3d 72, 81-82 (1st Cir. 2000); *United States v. Jones*, 766 F.2d 994, 1004 (6th Cir. 1985); *see also United States v. Granados*, 2020 WL 3258401, at *4 (C.D. Calif. June 15, 2020) (COVID-19 restrictions did not violate pretrial detainee's right to counsel in preparation for trial).

Defendants also contend that going to trial in November will compromise their right to be tried by a jury drawn from a fair cross section of the community. Defendants argue that COVID-19 has had higher levels of infection and mortality in minority and older populations, and, therefore, potential jurors from such groups are less likely to respond to the jury summons.

"It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from

a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. Section 1867(e) of the Jury Selection and Service Act provides a criminal defendant "the exclusive means by which a person accused of a Federal crime . . . may challenge any jury on the ground that such jury was not selected in conformity with the provisions of the" Act. 28 U.S.C. § 1867(e). To challenge the jury selection process, a criminal defendant, "before the voir dire examination begins . . . may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of [the Act] in selecting the grand or petit jury." 28 U.S.C. § 1867(a).

Defendants' argument on this issue is unavailing, for several reasons. First, the argument is premised on rank speculation, in that Defendants do not know what the composition of the venire will be. As a matter of fact, according to the Court's Jury Administrator, the response rate to jury summons since the Court resumed criminal jury trials is comparable to the pre-pandemic rate.

Second, to prove that the Court's jury plan violates the Jury Selection and Service Act, Defendants must provide evidence of a "substantial failure to comply with the Act's provisions, . . . that destroys the random nature or objectivity of the selection process." *United States v. Olaniyi-Oke*, 199 F.3d 767, 772 (5th Cir. 1999); *see also United Stats v. Reyes*, 252 F. App'x 659, 662 (5th Cir. 2007) (defendant must prove that the Court's jury plan produces an under-representation of one or more segments of the population). They have not presented any argument or evidence to

this effect.

Third, Defendants have not filed a motion pursuant to 28 U.S.C. § 1867(f) to inspect the contents of the records or papers used by the Court's Jury Administrator in summoning the venire for the petit jury in this case.

Fourth, even if the demographic composition of Defendants' venire happens to differ from that of the community, that doesn't necessarily mean that the Court's selection process is flawed. *Olaniki-Oke*, 199 F.3d at 772. "In a truly random system," particular demographic groups "will be over-represented in some . . . panels . . . and under-represented in others . . . ." *United States v. McKinney*, 53 F.3d 664, 671 (5th Cir. 1995). One venire is not sufficient to prove a failure to comply with the Act. *Id.*

To prove a violation of the Sixth Amendment's fair cross-section requirement, a Defendant "must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) the representation of this group in the venire panel is not reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion in the jury selection process." *Id.* "A defendant cannot establish a *prima facie* violation by relying solely on the composition of the jury at his own trial." *Olaniyi-Oke*, 199 F.3d at 773.

Therefore, Defendants' jury composition challenge is premature because they have no idea what the composition of the venire will be in this case. Moreover, they have not provided any evidence of "systematic exclusion" of any "distinctive" community group in this Court's petit jury panels. In fact, they have not even taken

24

advantage of the means available to them to investigate the Court's jury selection plan. *See* 28 U.S.C. § 1867(f).

Even if Defendants had evidence of an under-representation of any distinctive group on the venire in this case, they would still have to prove that the under-representation was caused by "systematic exclusion on the part of the government." *United States v. Haynes*, 2006 WL 1236059, at *2 (E.D. La. May 3, 2006). "There is systematic exclusion when the under representation is due to the system of jury selection itself, rather than external forces," such as a global pandemic. *Id.* (quoting *United States v. Rioux*, 97 F.3d 648, 658 (2nd Cir. 1996)). Defendants have not provided any evidence that this Court's jury selection process caused an exclusion of any distinctive group. In fact, they specifically argue that an external force – COVID-19 – will cause an under-representation. That is not a constitutional violation.

Next, Defendants argue that going to trial in November will violate their rights under the Sixth Amendment's Confrontation Clause. The Court's preventative measures, recited above, provide that any person in the courtroom must wear a mask or face shield, unless they are speaking. Therefore, witnesses will not be required to wear a mask while testifying, and they will testify from behind a plexiglass or vinyl barrier. Likewise, prospective jurors will be required to wear clear face shields, so that attorneys can see their faces during voir dire. Accordingly, there is no threat to Defendant's rights under the Confrontation Clause.

Finally, Defendants argue that going to trial in November will violate their

right to compulsory process of witnesses. This is simply not true. Defendants are still free to issue trial subpoenas, and if a witness does not comply with a subpoena, the Court will handle it in the same way it typically would. *See* FED. R. CRIM. P. 17.

Finally, the potential risk to the parties or their counsel is not sufficient to merit a continuance. District courts throughout the country have rejected constitutional challenges to pretrial detention in light of the COVID-19 pandemic. *See, e.g. United States v. Gonzalez*, 2020 WL 2615932, at *4 (N.D. Tex. May 22, 2020); *United States v. Hernandez*, 2020 WL 1876102, at *5 (N.D. Tex. Apr. 14, 2020); *United States v. Shelton*, 2020 WL 1815941, at *7 (W.D. Ky. Apr. 9, 2020); *United States v. Graham*, 2020 WL 1685912, at *6 (D. Minn. Apr. 7, 2020). Also, district courts have declined to quash trial subpoenas on the basis that attendance at trial places witnesses in danger of contracting COVID-19. *See, e.g. United States v. Casher*, 2020 WL 3270541, at *2 (D. Mont. June 17, 2020). Although these cases are not directly on-point, they are persuasive authority that the risk of contracting COVID-19 is not a sufficient reason to continue this trial, particularly in light of the measures the Court is taking to mitigate those risks. Additionally, federal courts across the country have been conducting jury trials without excess problems.

### III. CONCLUSION

The Court takes the pandemic seriously, as evidenced by the extensive preparations it has made in order to hold jury trials. Our present circumstances undoubtedly require flexibility and ingenuity, and aspects of this trial will be

26

different than others the Court has provided. But the Constitution doesn't require the Court to provide Defendants a perfect trial, just a fair one. *United States v. Rojas*, 812 F.3d 382, 410 (5th Cir. 2016).

"In a country where . . . controversy rages over when and what to reopen as time goes on . . . it is not surprising that such a controversy might arise in the context of court proceedings." Order Denying Petition for Writ of Mandamus at 2, *In re Tanner*, No. 20-10510 (5th Cir. May 29, 2020) (per curiam). But whether and how to proceed to trial in the present circumstances are questions firmly within a trial judge's discretion. *Id.* Like most, if not all, public agencies, this Court is in uncharted territory, making the best decisions it can with the present information. In preparing to hold criminal jury trials during the pandemic, the judges from this district have spent many hours weighing the costs, benefits, risks, and rewards of the various routes the Court could take. The Court considered the report from the COVID-19 Judicial Task Force on Conducting Jury Trials and Convening Grand Juries During the Pandemic, and it developed its own COVID-19 Jury Resumption Plan. Judges in this District have personally spoken with judges from other parts of the country, learning from their experience.

Moreover, this is not Defendants' counsel's first rodeo. Defendants retained experienced trial attorneys who are accustomed to the uncertainty that is inherent to trial practice. Defendants and their counsel are free to visit the courthouse and observe the preparations made for trial. Additionally, the undersigned judge would

27

be glad to meet with counsel in the courtroom at some point during the week before trial and answer any additional questions they may have.

In summary, the Court has considered the totality of the circumstances, weighed the risks and benefits of various courses of action, and crafted a plan that it believes reasonably mitigates the risk of transmitting COVID-19 in light of the Court's concomitant duty to promptly and efficiently administer justice. The parties are always free to provide input, but Defendants' motions are conspicuously free of practical suggestions as to how to hold a trial at this time. Instead, they just asked for a continuance to the spring, despite having already received two continuances and not knowing what the condition of the Court's docket will be by next year.

For all these reasons, the Court **denies** Defendants' Motions to Continue [49, 53] and Motions to Expand the Jury Venire [61, 65]. Jury selection is scheduled to begin on November 2, 2020, at the Dan Russell Federal Courthouse in Gulfport, Mississippi. The Court incorporates by reference the Chief Judge's Special Order #10 and the Court's COVID-19 Jury Resumption Plan, both of which are available on the Court's public website. All procedures and protocols outlined in this opinion and incorporated documents are subject to change depending on the circumstances at trial.

SO ORDERED AND ADJUDGED this 14th day of October, 2020.

_____/s/_____ Keith Starrett_____
KEITH STARRETT
UNITED STATES DISTRICT JUDGE